UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:14-00031-TWP-VTW |
| ) | |
| MIGUEL MOMPIE (07), ) | |
| RITZY ROBERT-MONTANER (08), ) | |
| ) | |
| Defendants. ) | |

**ENTRY DENYING MOTIONS TO SUPPRESS**

This matter is before the Court on Defendant Ritzy Robert-Montaner's ("Montaner") Motion to Quash Arrest and Suppress all Evidence Obtained as a Result Thereof (Filing No. 437) and Defendant Miguel Mompie's ("Mompie") Second Amended Motion to Suppress Fruits of Search (Filing No. 445). Montaner is charged with Conspiracy (Count 23) in violation of 18 U.S.C. § 371 and 18 U.S.C. § 659. Her co-defendant, Mompie, is charged with Interstate Transportation of Stolen Property (Counts 10, 12, 14, 16, 18 and 20), Possession of Goods Stolen from Interstate Commerce (Counts 9, 11, 13, 15, 17 and 19), and Conspiracy (Count 23). Both Defendants have petitioned the Court to suppress from introduction into evidence any and all items that were seized from their person and from a Chevrolet Sonic rental car on February 25, 2015. An evidentiary hearing was held on September 22, 2016. Pursuant to Federal Rule of Criminal Procedure 12(d), the Court now states its conclusions of law. For the reasons set forth below the Court **DENIES** each Defendants' Motion to Suppress.

**I. FINDINGS OF FACT**

On December 9, 2014, a semi-tractor and trailer containing 4,610 T-Mobile cellular telephones were stolen from a truck stop in Oklahoma City, Oklahoma (the "T-Mobile load").

(Filing No. 472 at 1.)  The stolen merchandise was valued at approximately $460,000.00.  *Id.*  On or about December 17, 2014, the FBI was contacted by an investigator hired by T-Mobile to investigate the theft of the T-Mobile load.  (Filing No. 472 at 2.)  The investigator reported that one of the stolen cell phones from the T-Mobile load had been activated at a location in Oklahoma City on December 10, 2014.  *Id.*  While other stolen cell phones were subsequently activated, the location and time of activation of this particular cell phone led the FBI to conclude that the phone activated on December 10, 2014 was in the possession of someone connected to the theft of the T-Mobile load.  *Id.*

Sometime during their investigation the FBI learned through a confidential informant that Mompie and others had recently stolen a load of T-Mobile telephones, and that Mompie was possibly carrying one of the telephones with him.  *Id.* at 3.  Upon receiving this information, the FBI acquired the toll records of the stolen cell phone.  *Id.*  An investigation on the telephone numbers associated with the stolen cell phone revealed call activity between Mompie and other associates, named by the confidential informant, that were also allegedly involved in the theft of the T-Mobile load.  *Id.*  After a review of the data, the FBI discovered that cell phones associated with Mompie and his associates had been active around the truck stop where the T-Mobile load was stolen, including on the same day.  *Id.*

On February 18, 2015, the FBI acquired a warrant to track and monitor the precise location of the activated stolen cell phone believed to be in the possession of Mompie, who resided in Jeffersonville, Indiana.

On February 23, 2015, the FBI with the help of the Kentucky State Police ("KSP") determined that the stolen cell phone had traveled to Virginia.  Wes Rowe ("Rowe"), an investigator with the National Insurance Crime Bureau ("NICB"), was contacted for assistance.

*Id.* The NICB is a non-profit organization that receives support from insurance companies, and its mission is to lead a united effort between insurers and law enforcement agencies to prevent and combat insurance fraud and crime. *Id.* Rowe's position within the NICB was to conduct complex fraud investigations in the southwest Virginia area and supervise all field operations for North and South Carolina. Rowe had previously been a deputy for the Wythe County Sheriff's Office ("WCSO"), and remained a reserve deputy with full law enforcement authority during his participation in the FBI investigation. In the five years that he had worked for NICB, Rowe had been involved in the investigation of approximately forty organized Cuban groups involved in cargo thefts.

Sgt. Motley (with the KSP) and FBI agent Paul Meyer ("Agent Meyer") advised Rowe that a Cuban suspect, known to be involved in cargo theft, had flown from Louisville, Kentucky to Chicago, Illinois and was currently tracked (via the stolen cell phone) to be at the Richmond International Airport in Richmond, Virginia. The suspect was identified as Mompie. Sgt. Motley and Agent Meyer informed Rowe that Mompie might be meeting with associates who were previously known by Rowe to have been involved in other cargo thefts.

In tracking the cell phone, Sgt. Motley and Agent Meyer began relaying, in real time, information to Rowe and other law enforcement officers involved in the investigation. Rowe was constantly advised of the cell phone's location. The cell phone was located near a Hewlett Packard distribution center in Richmond. The cell phone then traveled to Caroline County and was located near a McKesson distribution center. Rowe contacted Caroline County's Sherriff's office to put them on notice of the current situation and requested that they contact him if a cargo theft was reported. However, no incidents took place on that afternoon. Rowe kept tracking the cell phone

and alerting authorities along the cell phone's route. Once the cell phone reached Roanoke, Virginia and became stationary at a motel, Rowe ceased monitoring the activity.

The next day, on February 24, 2015, Rowe was contacted again because the cell phone was traveling on I-581/ U.S. 220 towards Greensboro, North Carolina. Rowe felt that it was likely that the cell phone was headed for the Ralph Lauren distribution center in Greensboro. The cell phone did travel to the area of the distribution center and its activity indicated, based on past behavior, that the subject was surveilling the center.

Rowe then alerted Ralph Lauren's Asset Protection Manager. After the manager began to track the outgoing truck loads via GPS, it was determined that the cell phone was following one of the truck loads that had recently left the distribution center. John Cannon of the Georgia Bureau of Investigation was advised of the situation as the load and the cell phone were headed towards the South Carolina/Georgia state line. Rowe and the Ralph Lauren manager were working together to determine if Mompie, who was in possession of the cell phone, would follow and steal the load.

However, before the two drivers in the truck received the information on where to do the controlled stop, they stopped at a gas station in South Carolina. The drivers stated that, while at the gas station, one of them went inside while the other one stayed with the truck. They also stated that they had been followed by a small silver car with three passengers, one of whom followed the driver into the store. After the two remaining passengers realized there was a second driver, the passenger who had gone inside went back to the car and they left the station. Tracking resumed, and it was discovered that the car was headed back towards Greensboro, subsequently becoming stationary at a motel two miles away from the Ralph Lauren distribution center.

The Asset Protection Manager was again informed of the situation, and she went to the motel near the Ralph Lauren distribution center to look for vehicles matching the description given

by the truck drivers.  The manager provided Rowe with the license plate numbers of four vehicles.  The only vehicle that proved to be a small silver four-door car was a Chevrolet Sonic that had been rented from Enterprise Rent-A-Car ("Enterprise") by Montaner.  Rowe recognized Montaner as the known girlfriend of Orlis Machado Cantillo ("Machado"), an identified member of a Cuban organized cargo theft group operating out of the Louisville, Kentucky area.

On February 25, 2015, the stolen cell phone returned to the Ralph Lauren distribution center.  It then began traveling towards Sanford, North Carolina, home of the Coty Cosmetics distribution center.  The cell phone did not stay in the area very long and began traveling north towards Wythe County, Virginia.  The appropriate authorities were contacted.  Rowe followed the cell phone to a TA truck stop and observed the silver Sonic, which was empty at the time.  Rowe watched the vehicle until a female and male exited the truck stop store and entered the vehicle on the passenger's and driver's sides, respectively.  Rowe was able to identify Montaner as the female driver, but was unable to identify the male.  Rowe did not see a third passenger.  A surveillance video at the truck stop showed that Montaner was following a truck driver inside the truck stop.  Both Montaner and the male went back into the truck stop for a few minutes before Montaner exited and left the truck stop alone in the silver Sonic.

Rowe contacted Brian Lawson ("Corporal Lawson"), the on-duty corporal for WCSO that evening, about his observations and that he thought a cargo truck theft might be occurring.  Rowe wanted the Wythe County officers to locate the silver Sonic while he continued to monitor the truck stop.  Shortly thereafter, the WCSO central dispatch broadcast that a tractor and trailer had been stolen from the TA truck stop.  Rowe provided Corporal Lawson with the cell phone's location near an area not far from the truck stop.  Corporal Lawson relayed all of this information to Deputy E. Wayne Kirby ("Deputy Kirby"), including a description and license plate number of

the suspect vehicle. While patrolling the area, Deputy Kirby spotted a silver Sonic coming from a dead end road, which now had three passengers. Deputy Kirby stopped the vehicle because it was traveling on a secluded dead end road, it was after 10:00 at night, and he was suspicious that the vehicle might have had something to do with the tractor and trailer that was just stolen in the area. Rowe arrived at the traffic stop and identified the three passengers as Montaner, Mompie, and Machado. Montaner was the driver and Mompie was the rear seat passenger. A search was conducted of the dead end area from which the suspects' car had just left and the stolen trailer and cargo were found. The tractor was found later, in a different location, unoccupied. The silver Sonic was stopped approximately one-third of a mile away from where the stolen trailer was found, and one and a quarter of a mile from the truck stop. The tractor was found four and a half miles from the truck stop where it was stolen.

Montaner, Mompie, and Machado were all arrested. Various items—including nine cell phones, a backpack, a gallon of white Valspar "Cover & Go" paint, a paint brush, a paint roller, a paint roller pan, a Blue Hawk 4-8' paint roller extension handle, and a GPS jamming device—were all visible in plain view in the rear passenger compartment of the vehicle. An Apple iPhone 6 was seized from Montaner's pocket incident to her arrest. After they were transported to the sheriff's office, Wythe County Investigator Adam Williams ("Investigator Williams") appeared before a magistrate judge and verbally requested and obtained arrest warrants. A Wythe County magistrate judge approved charges against Montaner, Mompie, and Machado for crimes related to cargo theft under Virginia state statutes.

On February 27, 2015, Wythe County Investigator Adam Williams ("Investigator Williams") applied for and received a warrant to search the silver Sonic from a Wythe County magistrate judge. In the Affidavit for Search Warrant, Investigator Williams indicated he sought

to search the vehicle for items "involved in the theft of a Tractor Trailer stolen from the T/A Travel Center, Wytheville, (Wythe County), Virginia on February 25, 2015." A second search warrant was issued on March 15, 2015, for the cell phones recovered from the vehicle. The affidavit for the cell phones alleges in part, that the affiant (Investigator Williams) is aware through training and experience that persons involved in Grand Larceny work in concert with other persons and often use electronic devices to communicate prior to, during, and after the crime has been committed.

On June 24, 2015, Mompie and Machado, along with other alleged associates, were named in a twenty-three count federal Superseding Indictment charging them with possession of goods stolen from interstate commerce, interstate transportation of stolen goods, and conspiracy (Filing No. 32). Montaner is charged only with conspiracy. The February 25, 2015 theft of the Coty Cosmetics load is listed as an overt act in the conspiracy. *Id.*

## II. DISCUSSION

Montaner filed a motion to suppress asserting that officers had no probable cause to arrest her or obtain a warrant to seize and conduct searches on the items found in her rental car. ([Filing No. 437](#).) Therefore, her arrest and the items seized during the subsequent search should be suppressed. For his part, Mompie filed a second motion to suppress any and all items seized from his person and from the silver Sonic on the day of his arrest. ([Filing No. 445](#).) Additionally, Mompie argues that the traffic stop of the silver Sonic on the day of his arrest was unconstitutional. In its Response, the Government argues that the arrest and search were substantiated by probable cause and argues that Mompie lacks standing because he had no legitimate expectation of privacy in the silver Sonic, and reasonable suspicion existed at the time Deputy Kirby stopped the vehicle. The Court will address the Defendants' respective motions in turn.

A.     **Montaner's Motion to Suppress the arrest and stop of her rental car.**

Montaner asserts that officers did not have probable cause to arrest her. She argues that the officers never saw her in, or even near, the stolen tractor trailer and the only basis for establishing probable cause is that she was observed in the truck stop when the theft took place. As support, Montaner cites several cases which conclude that being in the presence of a guilty party does not make another person guilty as well. *United States v. Di Re*, 332 U.S. 581, 594 (1948); *Ybarra v. Illinois*, 444 U.S. 85, 91(1979); *United States v. Soyland*, 3 F.3d 1312, 1314 (9th Cir. 1993).

The Government argues that based on the totality of the circumstances, the officers had probable cause to arrest Montaner under the "collective knowledge doctrine," which allows an officer to act if he is reasonably relying on information from another officer. *United States v. Nicksion*, 628 F.3d 368, 376 (7th Cir. 2010); *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992). They assert that Deputy Kirby received detailed information from Corporal Lawson and Rowe regarding the vehicle and the actions of its passengers, and thus he had probable cause to stop the silver Sonic and arrest Montaner.

In order to arrest a person without a warrant, a law enforcement officer must have sufficient information and evidence to establish probable cause for the arrest. "Probable cause is established when, considering the totality of the circumstances, there is sufficient evidence to cause a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Harris*, 464 F.3d 733, 738 (7th Cir. 2006).

The Court finds that the officers had the requisite probable cause to arrest Montaner. Law enforcement officers had established a connection between Montaner and her boyfriend (Machado), who had been previously associated with similar crimes. Rowe and other officers had been tracking the vehicle that Montaner had rented and was driving across several states and to the

area of several different distribution centers. The silver Sonic that she had rented, via cell phone tracking, had been surveilled following a cargo load to a gas station. The silver Sonic was later tracked as following another cargo load. At the time of the theft of the Coty Cosmetics load, Montaner was seen on video in the truck stop following the truck driver. When Montaner was finally stopped in the car, the vehicle was leaving a secluded area where the stolen cargo load was later found. Based on the collective knowledge doctrine and all of the evidence acquired by all of the law enforcement agents, there was a sufficient amount of information to believe that there was a crime and to arrest Montaner.

In addition, to support their argument that officers had probable cause to arrest Montaner, the Government argues that Montaner is wrongfully describing the stop of her vehicle as an arrest. The Government asserts that the officers only needed reasonable suspicion to perform the stop of her vehicle if they believed that criminal activity was taking place. *Terry v. Ohio,* 392 U.S. 1, 21-22 (1968). Since reasonable suspicion is a lower standard, the Government asserts that all of the factors (*i.e.*, Montaner's renting/driving of the car, the video of her following the truck driver in the truck stop) taken together formulated reasonable suspicion, thereby validating the stop of Montaner's car and her subsequent arrest. The Court agrees. Deputy Kirby was patrolling the area based on the report of a possible cargo theft. It is the duty of police officers to verify or dispel any claims of criminal activity reported by citizens or fellow officers. Therefore, it was reasonable for Deputy Kirby to stop a car that matched the description of the suspects' vehicle which was traveling on a dead end road that is rarely used in the nighttime, to investigate further. This reasoning further supports the Court's conclusion that the stop and arrest were valid and substantiated by probable cause.

**B.    There was probable cause to support the search warrants.**

Montaner also asserts that there was no probable cause to validate the warrants that allowed officers to seize and search the items, including the cell phones, which were removed from the silver Sonic. She asserts that there must be substantial evidence on the record and in the "four corners" of the affidavit to support the magistrate's probable cause finding. *United States v. Koerth*, 312 F.3d 862, 865 (7th Cir. 2002). Montaner cites a Sixth Circuit opinion, holding that probable cause needed to search a cell phone requires the phone being used for purposes of committing a crime. *United States v. Sims*, 508 Fed. Appx. 452, 460 (6th Cir. 2012). She relies on *Riley v. California*, which held that the warrantless internal search of a cell phone is not valid simply because the phone's owner is in custody. 134 S. Ct. 2473 (2014).

In response, the Government argues first that the Court must not conduct a *de novo* review of the sufficiency of an affidavit and that reviewing courts should give deference to the magistrate's decision. *Illinois v. Gates*, 462 U.S. 213, 236 (1983). The Government asserts correctly that the only duty of the reviewing court is to determine whether the magistrate had a substantial basis for making his finding of probable cause. *Id.* at 234.

As the Court determined above, there was sufficient evidence to support a finding of probable cause to stop and arrest Montaner. Much of the same evidence was presented in the affidavit for the search warrant. The affidavit stated the following:

> On February 25, 2015, Deputy Wayne Kirby conducted a traffic stop near the intersection of Bob Spring Road and Lithia Road in Wytheville (Wythe County), Virginia. The stop came as a result of an investigation involving the theft of a 2012 International TT with a 2010 Utility Box Trailer containing approximately $225,000.00 in Coty Cosmetics. As a result of the traffic stop, three subjects (Ritzy Montaner ROBERT, Miguel Roberto MOMPIE, and Orlis Cantillo MACHADO) were detained, identified and arrested for theft of the aforementioned items, which were recovered a short time after the traffic stop at two separate locations in Wythe County.
>
> On February 26, 2015, while following up on the theft, members of your affiant's investigative team identified one of the suspects, ROBERT of Louisville,

> Kentucky, as being inside the T/A Travel Center, Wytheville (Wythe County), Virginia. ROBERT was observed following William Douglas BADKER throughout the store. BADKER was the operator of the International TT that was stolen by ROBERT, MOMPIE and MACHADO, and ultimately recovered by members [sic] your affiant's investigative team.

([Filing No. 437-2 at 3](#)).  The information in the affidavit sufficiently provided probable cause for the search of the vehicle.  The magistrate was informed of Montaner's conduct, including that she had been seen following the victim driver in the truck stop and that she had been stopped near where the stolen trailer was found.

The Government asserts other compelling arguments to support the validity of the vehicle search.  They argue that the officers did not need a warrant to search and seize the items found at the time of the arrest because the items were in plain view.  The Government asserts that all evidence would inevitably have been seized during an administrative investigatory search and the search of Montaner's rental car was subject to the motor vehicle exception to the warrant requirement.  *United States v. Ross*, 456 U.S. 798 (1982) (validating the warrantless search of an automobile if supported by probable cause).  Additionally, the Government contends that the search of Montaner's rental car was lawful, irrespective of the search warrant, as law enforcement authorities were collectively cognizant of facts which, given the totality of the circumstances, indicated a fair probability that evidence of a crime would be found in the vehicle.

With respect to the search warrant of the electronic devices recovered from the rental car, Montaner again argues that the search warrant affidavit fails to establish probable cause.  The search warrant affidavit reads as follows:

> On February 25, 2015, Deputy Wayne Kirby (Wythe County Sheriff's Office) detained the persons listed in Section 2 of this affidavit on suspicion of Grand Larceny of a Motor Vehicle in Wytheville (Wythe County), Virginia from the TA Truck Stop. Upon further investigation, it was determined that the aforementioned individuals had commited [sic] grand larceny and were arrested and formally charged with numerous felony warrants. In the following days, your affiant and

11

> members of your affiant's investigative team, conducted several other follow-up investigations and discovered that at least one, if not all, of these subjects were caught on video at the T/A Truck Stop in Wytheville (Wythe County), Virginia just prior to their encounter with Deputy Kirby. Four of the cellular telephones described in Section 2 of this affidavit were seized search incident to arrest of the aforementioned individuals. The other four cellular telephones, along with the Apple MacBook Pro laptop computer, were seized as a result of a search warrant executed on the 2014 Chevrolet Sonic passenger car that the persons listed in Section 2 of this affidavit were in prior to being stopped by Deputy Kirby on February 25, 2015. Your affiant is aware through training, experience, and conversations with other law enforcement officers that persons involved in the crime of Grand Larceny and work in concert with other persons, often use electronic devices such as the ones described in Section 2 of this affidavit, to communicate prior to, during, and after the crime has been committed.

([Filing No. 437-3 at 3](#).)

  The Government responds that Montaner does not assert that she owned, possessed, or used any of the devices searched. As such, if the cell phones and computer belonged to the passengers in the car, then Montaner has no expectation of privacy and does not have "standing" to challenge the search and seizure. *See United States v. Stringer*, 739 F.3d 391, 396 (8th Cir. 2014). However, one of the cell phones was retrieved from Montaner's pocket and the other devices were seized from her rental car. The Court finds that Montaner clearly has standing for at least the device on her person and, likely, for the devices located within her vehicle.

  The Government asserts that even if Montaner had a reasonable expectation of privacy in the devices, the affidavit was supported by probable cause, and the search of the items was valid. The Court agrees. In a succinct fashion, Investigator Williams informed the magistrate that the cell phones were seized incident to the arrest of the defendants, and through his training, experience, and conversations with other law enforcement officers, he was aware that persons involved in the crimes charged often work in concert with other persons and use electronic devices such as cell phones and laptop computers to communicate prior to, during, and after the crime has been committed. Further, by March 19, 2015, the date of the affidavit, Montaner and her

codefendants had already been formally charged with felony offenses related to cargo theft. Based on the totality of the circumstances, the information given the magistrate was sufficient to determine probable cause that evidence of a crime would be found on the devices.

Finally, even if the warrants were subsequently invalidated, suppression is only appropriate when the officers did not rely in good faith on the magistrate's finding of probable cause. *United States v. Bell*, 585 F.3d 1045, 1052 (7th Cir. 2009) (suppression of evidence seized pursuant to a search warrant that is later declared invalid is inappropriate if the officers who executed the warrant relied in good faith on the issuing judge's finding of probable cause). Here, law enforcement officers reasonably and in good faith relied on the validity of the search warrants. Accordingly, Montaner's Motion to Suppress is **denied**.

C.  **Mompie lacks standing to contest the search and seizure of items in the Chevrolet Sonic.**

Mompie moves the Court, pursuant to the Fourth Amendment of the Constitution, to suppress from introduction into evidence all items that were seized from his person and the silver Chevrolet Sonic rental car, in which he was a passenger.

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. CONST. Amend. IV. "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property (such as someone else's vehicle) has not had any of his Fourth Amendment rights infringed. *Id.* at 134; *United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2009). The Fourth Amendment will only protect an individual from a search or seizure if they themselves have a legitimate expectation of privacy in the invaded place. *Minnesota v. Carter*, 119 S. Ct. 469, 473 (1998). Moreover, a defendant

13

objecting to a search pursuant to the Fourth Amendment bears the burden of proving that he had a legitimate expectation of privacy in the area searched. *Yang*, 478 F.3d at 835. To challenge the search, Mompie must show that he had both a subjective expectation of privacy and an objective expectation of privacy that society recognizes as legitimate and reasonable. *See United States v. Haywoo*d, 324 F.3d 514, 515-16 (7th Cir. 2003).

The Government argues that Mompie lacks standing to contest the search of the vehicle because he was a mere passenger in the rental car. ([Filing No. 472 at 21](#).) The issue of standing regarding a rental vehicle is one that has been wrestled with in this Circuit, as well as others. This issue becomes more challenging when assessing a passenger's expectation of privacy in a rental vehicle.

Mompie cites to two Seventh Circuit cases in support of his argument for standing. He first cites to *United States v. Sanford*, 806 F.3d 954 (7th Cir. 2015). In *Sanford*, the Seventh Circuit declined to address the issue of standing regarding an unlicensed driver of a rental car. Sanford was a passenger of the rental car at the time it was stopped for speeding. Subsequently, drugs were found in the vehicle and Sanford, along with the driver of the car and another passenger, were arrested on drug charges. *Id.* at 955-56. The Seventh Circuit noted that there is currently a circuit split regarding the issue of standing when it comes to an unauthorized driver of a rental car. *Id.* at 958. After concluding that most circuits preclude standing for such individuals, the Seventh Circuit declined to decide the issue. Instead, the court held that because Sanford had standing to challenge the seizure of his person when the car was stopped, then he also had standing to challenge any search that resulted from that seizure if the seizure was unlawful. *Id.* at 958-59.

Mompie makes much of the fact that in *Sanford* the Seventh Circuit mentioned that Sanford's lack of a valid driver's license might preclude his standing regarding the search of the

14

vehicle. *Id.* In contrast, Mompie argues that, because he had a valid Commercial Driver's License, he has standing. However, in *Sanford*, as noted above, the Seventh Circuit did not decide the issue of standing regarding an unauthorized driver of a rental car. Therefore, *Sanford* does not provide any compelling support for Mompie's standing argument regarding the search of the Chevrolet Sonic.

Mompie also cites to *United States v. Walton*, 763 F.3d 655 (7th Cir. 2014), in support of his standing argument. In *Walton*, the Seventh Circuit decided that an authorized driver of a rental car with an invalid license to drive had standing to challenge a search of the rental vehicle. *Id*. at 666. In *Walton*, the defendant was the authorized driver of the rental car under the rental agreement, but he had a suspended license. At the time of the stop and search of the vehicle, Walton was a passenger in the vehicle. Nonetheless, because he was the authorized driver of the vehicle, the fact that he had an invalid license did not preclude his standing to challenge the search.

Here, Mompie was not an authorized driver of the silver Sonic. In fact, the only authorized driver was Montaner, who was driving the vehicle when it was pulled over on the day of their arrest. ([Filing No. 472 at 23-25](#).) Mompie argues that he was an authorized driver because Montaner granted him permission to drive the vehicle earlier in the day. ([Filing No. 484 at 2-3](#).) However, Mompie wrongly concludes that Montaner had such authority. The owner of the vehicle was EAN Holdings (d/b/a Enterprise), and under the terms of rental agreement, only Enterprise had the authority to make someone an authorized driver of the vehicle. The rental agreement did not grant Mompie such authority and, therefore, unlike the defendant in *Walton*, Mompie was not an authorized driver.

The Court notes that the Seventh Circuit has not yet decided whether a properly licensed but unauthorized driver of a rental vehicle has standing to challenge a search of the vehicle, and it

is not necessary for this Court to determine that issue today for the following reason: even if Montaner imparted some sort of sub-tenant authority to Mompie by allowing him to drive the vehicle, it was Montaner who was driving at the time of the stop and search. Mompie was merely a passenger at the time of the search and the Seventh Circuit has determined that a passenger lacks standing because he cannot protect his privacy in a car that he has no power over. *Walton*, 763 F.3d at 666. The fact that the authorized and licensed driver was driving the vehicle at the time of the search distinguishes this case from *Sanford*, where the authorized driver was not in the vehicle. Mompie, as a mere passenger of the vehicle at the time of the search, lacks standing to challenge the search of the vehicle.

**D.     The traffic stop that led to the arrest of Mompie was proper because Deputy Kirby had reasonable suspicion to stop the vehicle.**

Mompie also objects to the search and seizure of items on his person because the initial stop made by Deputy Kirby was illegal as there was no reasonable suspicion for the investigatory stop. (Filing No. 446 at 5-6.) Among the items seized from Mompie's person were personal papers, clothing, his Indiana Commercial Driver's License, and $435.00 in currency.

An investigative stop is a "brief detention which gives officers a chance to verify or dispel well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity." *United States v. Bullock*, 632 F.3d 1004, 1014–15 (7th Cir. 2011). When determining whether a police officer had reasonable suspicion to stop or further detain an individual, "the district court must evaluate the 'totality of the circumstances' to assess whether the determining officer has a 'particularized and objective basis' for suspecting illegal activity." *United States v. Zambrana*, 428 F.3d 670, 675 (7th Cir. 2005). "Reasonable suspicion is more than a hunch but less than probable cause and considerably less than preponderance of the evidence. It requires some minimal level of objective justification for making a stop given the totality of the circumstances."

16

*United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008). In evaluating the reasonableness of an investigatory *Terry* stop, a court must first examine whether the officer's action was justified at its inception; the court must then determine whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *Terry*, 392 U.S. at 20; *see Jewett*, 521 F.3d at 823.

Mompie argues that the initial stop of the Chevrolet Sonic was illegal because there was no reasonable suspicion to stop it. ([Filing No. 446 at 6](#).) Specifically, he asserts that he and his associates had not been seen around the stolen tractor and trailer, and the only possible link between him and the stolen tractor and trailer was the fact that Deputy Kirby had been told to look out for a silver Chevrolet Sonic. *Id.* Additionally, Mompie argues that Deputy Kirby could not have operated under the "collective knowledge doctrine," because Deputy Kirby was relying on information provided by Rowe, a private civilian. *Id.*

Mompie fails to recognize that the information obtained by Rowe and conveyed to Deputy Kirby by Corporal Lawson of the WCSO was not the sole reliance for the stop. As detailed above, the investigation of Mompie and his associates was a combined effort between the FBI, local state police agencies, and the NICB. Additionally, Rowe testified that he was a reserve deputy with WCSO, which afforded him full law enforcement powers. The information possessed by all law enforcement officers involved in the matter constitutes exactly what the collective knowledge doctrine allows.

Notably, the Court has previously determined that the stop of the silver Sonic was proper under the reasonable suspicion threshold as there were enough articulable facts to justify a reasonable suspicion by Deputy Kirby. Therefore, the stopping of the silver Sonic and search of his person (incident to arrest) was permissible, and Mompie's Motion to Suppress is **denied**.

### III.  CONCLUSION

For the reasons stated above, Montaner's Motion to Suppress (Filing No. 437) is **DENIED**.

Additionally, Mompie's Second Amended Motion to Suppress (Filing No. 445) is also **DENIED.**

**SO ORDERED.**

Date: 10/20/2016

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

James Adrian Earhart
attyearhart@aol.com

Larry D. Simon
SIMON LAW OFFICE
jan@hcslegal.com

James Marshall Warden
UNITED STATES ATTORNEY'S OFFICE
james.warden2@usdoj.gov

Matthew Rinka
UNITED STATES ATTORNEY'S OFFICE
matthew.rinka@usdoj.gov